May it please the court, government, counsel, good morning. My name is Jason Carr. I represent Richard Thomas Simmons, the appellant in this matter. This is a search and seizure case, a traffic stop case that can really be analyzed under two rubrics. The first is what the magistrate judge did. The magistrate judge held that this was a drug stop from its inception and analyzed reasonable suspicion under that assumption. To support the magistrate's finding of reasonable suspicion, the district court looked at three things. One, that he left what was supposedly a known drug house. Two, that it was a high-crime area. And three, that it was at night. It was 7, 10 p.m. Now, after doing a variety of these suppression issues in this court, it just amazes me how wide an area is a high-crime area in Las Vegas. It's like the whole city is a high-crime area. How much weight, it's clear to this court that no factor can be discounted completely, but how much weight should we get to this factor that this was a high-crime area? Well, the case log gives us some guidance on that. It says not very much. And why is that? Because people who are disadvantaged and poor happen to live in high-crime areas. The Fourth Amendment doesn't allow law enforcement the right to go and search people just because they happen to live in a disadvantaged area. So it's a factor, but it's one that's not worth a lot. The other factor, 7 p.m. almost speaks for itself. I mean, that's not an unusual time to be traveling. We can't give law enforcement the sanction to pull people over at 7 o'clock because it happens to have become dark at that time. You know, I understand that the magistrate said the interest was drugs, but why isn't this simply a traffic stop? I'm sorry? Why isn't it just a traffic stop? The officer says that he followed the car and he didn't stop it until he went through a stop sign. Right. Clearly, this was a protectionist stop. The officer saw him leave what he thought was this drug residence and pulled him over once he had spied a traffic violation. But doesn't the Supreme Court say that that's okay we don't look at the motivation if there is indeed a traffic violation? That is absolutely true. But the thing is, when you do a protectionist stop, you have to do it right. And what do I mean by that? If I'm stopping somebody over for a traffic violation, then that is a traffic stop that deals with the traffic violation. The scope of your questioning and your inquiries that occur after the stop have to deal with that traffic violation. Would you be entitled in a traffic violation to inquire about weapons? I do not think that is an accurate statement of the law, Your Honor, and it's a matter of some contention, actually. But if you look at the case of United States v. Chavez-Valenzuela, what this Court seemed to imply there was that questions dealing with drugs was not within the rubric of a standard traffic stop analysis. Well, drugs I understand. I'm just kind of wondering whether, I think aside from domestic disputes, the most dangerous thing that police officers do is make traffic stops. It's also the most common thing they do, Your Honor. Pardon? It's also the most common thing they do. Yes, it is. But I wonder if you're making a stop in the dark, whether it's permissible to say, do you have a weapon? Well, that is an area where the law is unsettled. The gravamen of this Court's precedent seems to indicate that if you pull somebody over for a traffic stop, if you expand the scope of your questioning into matters dealing with other crimes, such as the possession of weapons or drugs, then you have exceeded the scope of the basis for that stop. Now, in Wren, the case which said pretextual stops are okay, what happened was the officer pulled the individuals over, he walks up to the car, and they're in the car holding baggies of crack cocaine. Now, obviously at that point, you have further suspicion to investigate another crime. So if you're an officer, if you're going to do a pretextual traffic stop, you have to keep it within that confine. This officer recognized your client, did he not? Yes, he did. Had had a previous, at least one previous encounter? Of like three over the past two months, according to the testimony. So he knew who he was? He did know who he was. Do you know a little bit about his background, including his criminal record? Which I would submit helps me. Because first of all, what do we know about his criminal record? It's old. We have a 95-97 conviction, this traffic stop occurred in 2003. They both are convictions dealing with pure theft-related offenses. Nothing to do with drugs or guns. This officer had dealt with this individual on three occasions recently, and no time was this, did my client act rude or obstreperous toward the officer. The officer testified that he was always cooperative with him. In fact, this officer testified that based on his prior dealings with this particular individual, he had no reason to believe that he was armed other than this whole drugs and guns go together rubric, which I would submit isn't even valid when you're talking about drug purchasers rather than drug dealers. And I said another important point about this record, and I would submit that any factual durst in this record or factual issues that should have been explored further are fully charged to the government. One thing that this record does not help us out with a lot is why does this officer think this is a drug house? At one time, he says, oh, I had prior dealings with the owner. But we don't know why. Why does he think this is a drug house? What is the quality of his information? What does he have to support that? Were there convictions, warrants served at this house? We know none of this. In the United States v. Thomas, this Court held that when we have this vague, unsupported, unparticularized allegations of a residence being a drug residence, that that's not going to give a lot of weight to a reasonable suspicion. Does the record indicate what kind of a residence this was? Condominium. It's a condominium. Oh, being a condominium. And that's on page 77 of the DOR. Right. Does it either? Oh, 72, excuse me. Does he know? Was there any way the officer had of knowing who was in which unit? I'm so glad you asked that because I would submit from this record no. And the best evidence we have is on page 72. And the Court does a better job, I would submit, than the government in fleshing out the facts in this because the Court takes this officer on direct and cross-examination for a number of pages. But on page 72, the Court asks Officer Cannon about, was it, this is the end of 71, was it the only car parked at the residence? No. The complex. It's a bunch of condominiums, says the officer. The Court, oh, okay. Witness, officer. And that vehicle was parked not in one of the stalls, the parking stalls. It was parked right outside one of the garages. One of the garages. And each of the stalls in front of the house had vehicles in front of them. So what we have here is a car leaving a condominium complex, one of the units of which is suspected of drug activity. There's nothing in this record that allows the government to say this officer saw my client walk from a residence to his car, the drug residence, to his car and drive away. In fact, we have reason to believe that that's not what happened because the officer testifies a number of times that he didn't recognize Simms until he walked up to the car. Now, what happens when he walks up to the car? Well, there's no traffic stop thing going on at all. He doesn't ask him for a driver's license. He doesn't ask him for registration. He doesn't ask him where you're coming, where you're going, is this car yours, anything related to vehicle theft, nothing like that. What happens is, Mr. Simmons, you're out of here, out of the car. You're coming to the police car. Do you have any drugs or guns? I'm searching you. That's what happens. And the mistake the officer made here was he had a valid protectional stop and he just expanded the scope of that stop before he had sufficient articulable suspicion to expand the scope of the stop. And that's if you look at this as such can be suggested as a traffic stop. If you look at it as the magistrate court held and made findings on as a drug-related stop, then it becomes simpler. All you have to do is look at, well, is leaving a condominium where a drug house allegedly exists, high crime area, and 7 o'clock at night, are those sufficient bases for finding reasonable suspicion? It really becomes that simple. The traffic stop gets a little more complicated because then you have to get into, well, did he impermissibly expand the scope of a traffic stop? And the law is a little more muddy in that area. But I would submit it's still heavily on my side. Another case that I would cite to as support for the scope of the questioning is United States v. Perez, which is in my brief and the government's brief. And they talk in there, and the quote there is, The questions asked in an investigative stop must be reasonably related in scope to the justification for their initiation. And additionally, in Heidel, the recent Supreme Court case that came out this year, the Supreme Court there affirms this precedent saying that a tarry stop must be tied in to the bases for the reasonable suspicion. If it's a tarry stop because of a traffic violation, then the inquiry must relate to a traffic violation. And I'd like to save the rest of my time for rebuttal, if I may. Thank you. Thank you. Mr. Reed. Police Court. William Reed for the United States. In this case, the facts, I would suggest, are relatively straightforward, maybe not as much uncontroverted. But we have an officer who I would submit to the court was very candid in his testimony about what he was doing that night and what his actions were. And he is basically staking out this multi-unit residence, a condominium, if you will, which he explained to the magistrate judge. And the magistrate judge was fully aware from the officer's testimony what type of residential facility this was. The officer observes a vehicle. And on page 41 of the record, I believe it's his testimony that he had previously seen this vehicle at this residence. I noticed the vehicle, the blue minivan, from previous stops at a known drug house, drug trafficking house. So it appears the officer places some emphasis not only on the residence but the vehicle as well. He does not know who he's dealing with until the time that the stop is actually effectuated in this case. And there is no disagreement among the parties or between the parties as to that this was, in fact, a valid traffic stop. Initially, the defendant raised that in his motion to suppress that the traffic stop was not valid, but that was later abandoned. So we do have a valid traffic stop, and that's not an issue before the court. The officer does not learn who he's dealing with until he encounters Mr. Simmons. And at that point, as Your Honor has already noted, he does recognize Mr. Simmons from prior dealings. He does. He is aware of his record or that he is a convicted felon, if you will. And things evolve a little more from the initial, from what he had at the outset. And it's not a situation, or I suggest you can't look at this situation in a vacuum. The officer is there alone that night. He describes the area as a high-crime area. He describes the defendant as having come from a drug house, if you will. And the officer is alone. It is nighttime. The officer, well, if I could first also try to analyze this. And there probably is, as Mr. Carr has suggested, two different ways to analyze this. One is a reasonable suspicion encounter with Mr. Simmons where the officer inquired whether he had drugs or weapons. And also perhaps the expansion of the traffic stop. So the issues seem to be somewhat overlapping. The magistrate judge found that there was reasonable suspicion. Again, all the variables that have already been parroted to the court about the drug trafficking or the drug house, the high-crime area, the time of night, the defendant's prior record. I would submit those things. Once he makes the traffic stop and then asks questions about guns and drugs, do you have to convince us that there's an articulable suspicion of drug activity to sustain those further questions? Do you concede that the scope of the stop has changed? Your Honor, I would not analyze this as a situation where this is an expansion of a traffic stop. The cases, I've read those cases over and over and over again, and the court's concern with those situations seems to have been where the officer does truly expand the traffic stop, where the officer prolongs the encounter, where the officer goes beyond and drags it out for an extended period of time. Here the officer, that's not the situation in this case at all, and that's undisputed. The officer quickly and at the outset asks the defendant if you have any weapons or drugs and does not engage in any type of delay tactics, any coercive tactics, anything to prolong the situation. So I would suggest that this is not in the traditional vein of an expansion of a traffic stop, if that's responsive to the court. The officer was prudent to ask this question, given the variables that he faced that night. And while it was not a consensual encounter, because there was a stop that was effectuated, the situation was such where the defendant could, he denied having drugs or weapons, and then the officer asked for his consent. And that's another alternative argument that the government made at the district court and continues to make here today, that the defendant did give valid consent for a pat down or a frisk of his person. The officer did not, he was one, he was the only officer there. There was no overbearing number of law enforcement officials there at this roadside scene. The officer didn't unholster his weapon. All the consensual checklists of things were there, and the defendant, in fact, I would suggest to the court, did give valid consent to allow the officer to pat him down. The officer patted him down, recovered a small amount of methamphetamine, found a shotgun slug or shotgun shell in the defendant's pocket, and from there the officer had probable cause to search the defendant's vehicle based upon what he'd recovered in his pocket, that is, the shotgun shell. Didn't the defendant at that point tell him there was a weapon in the car? Your Honor, that is correct, Your Honor. The officer, I think, did pose a question, what are you doing with this? And the defendant, according to the testimony in the record, hung his head and acknowledged to the officer that he had a short barrel or a sawed-off shotgun in the vehicle. And that is exactly what occurred from the point where the shotgun shell was recovered. So the government concurs not only with the magistrate's position on this, that there was reasonable suspicion given all the variables that the officer had there, especially when he learned that this individual was someone who he had encountered in other situations involving stolen cars, I believe was the testimony part of the record. There had never been an arrest made, and he's aware that this individual, when he meets him face-to-face, is a convicted felon. But in addition, the defendant gave his consent during this encounter to allow for the pat-down, which led to probable cause for the recovery of the shotgun in this case. Unless Your Honors have any additional questions. Okay, I think not. Thank you, Mr. Reed. Thank you. Mr. Carr? The government's right that our initial motions to suppress only dealt with this as a traffic stop problem. And why is that? Because if you look at the officer's report on page 20, in the excerpts of record, there's nothing in there about there being a drug house or I saw him leaving a drug residence or I recognized the car. None of this at all is in the officer's report. He doesn't testify to any of this until the motion is suppressed in August. So it came as somewhat of a surprise at that time. If we look at this, once again, whatever mode of analysis this Court wants to go with, one factor you're going to have to look at is how much significance do we give this leaving the condominium area? And I would point the Court to United States v. Thomas, which talks about comings and goings from a suspected drug house and how much weight to put on that as a reasonable suspicion factor. It's interesting that the officer does testify that he knew this vehicle before, or at least may have seen this vehicle at the house before, but he never testified to ever seeing Simmons at the house. In fact, he'd known Simmons. He ran into him on other occasions, other law enforcement endeavors, and never testified he ever saw Simmons at this house or Simmons in that car or anything. And that's significant. And other than that, Your Honor, however this Court decides to analyze this question, I would submit that when you parse down the reasonable suspicion factors, you'll find that when the officer asked that critical question, the critical question being do you have any drugs or guns on you, that at that point he just didn't have a reasonable basis under the law, under the Fourth Amendment, to ask that question, and that's when the stuff became invalid. Thank you. Thank you, Mr. Reed. The matter just argued will be submitted, and the Court will stand in recess for the day.  Thank you, Your Honor. The evidence in this interrogation argument is that the defendant has a firearm. I'll say he has. The defendant has a firearm. The defendant has a gun. The defendant has a gun.
judges: Canby, Rymer, Hawkins